**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

FRANK SALVADOR ALVARADO,

        Plaintiff,

vs.

BRIAN GARDNER, et al.,

        Defendants.

No.  C19-86-LTS-MAR

**MEMORANDUM OPINION AND
ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

## I.  *INTRODUCTION AND PROCEDURAL HISTORY*

This case is before me a motion (Doc. 59) for summary judgment by defendants Linn County, Brian Gardner, Peter Wilson, Matthew Sandvick, Kent Steenblock, Kelly Ehrisman, Amanda Roberts, Robert Braksiek, Todd Egli, Corey Sandersfeld, Joseph Chapman, Andrew Bratek and Chelsea Behel (defendants).[1]  Plaintiff Frank Alvarado filed multiple resistances (Docs. 63, 66, 67) and defendants filed a reply (Doc. 69).  Oral argument is not necessary.  *See* Local Rule 7(c).

Alvarado's pro se complaint was filed on September 29, 2020.  Doc. 11.  I then granted Alvarado's motion (Doc. 32) to appoint counsel.  Doc. 35.  Alvarado filed an amended complaint on March 21, 2022, seeking relief pursuant to 42 U.S.C. § 1983 based on defendants' alleged (1) deliberate indifference to a serious medical need and (2) use of excessive force.  Doc. 46.  Defendants filed an answer on April 1, 2022.  Doc. 48.  Trial is currently set to begin on March 6, 2023.[2]

---

[1] The individual defendants are named in both their personal and professional capacities.

[2] As noted in the conclusion of this order, this trial date must be continued.

## II.    RELEVANT FACTS

The following facts are undisputed except where otherwise noted:

Alvarado was incarcerated at the Linn County Correctional Center (LCCC) from December 12, 2018, until November 25, 2019, as a detainee of the United States Marshals Service (USMS).  Doc. 59-3 at 6.  At all relevant times, defendants worked in the following capacities in or related to the LCCC: Brian Gardner, Linn County Sheriff; Peter Wilson, Jail Administrator; Matthew Sandvick, Assistant Jail Administrator; Kent Steenblock, Assistant Jail Administrator; Todd Egli, Sergeant; Corey Sandersfeld, Deputy Sheriff; Joseph Chapman, Deputy Sheriff; Andrew Bratek, Deputy Sheriff; Chelsea Behel, Deputy Sheriff; Robert Braksiek, Medical Director; Kelly Ehrisman, Nurse and Amanda Roberts, Nurse.  *See* Doc. 59-3.

### A.    *Alvarado's Chronic Back Pain*

Braksiek first met with Alvarado on Feb. 12, 2019, to discuss his chronic back pain, which predated his incarceration at the LCCC.  Doc. 59-3 at 68; Doc. 72-3 at 3. Braksiek recommended Alvarado undergo a physical therapy evaluation.  Doc. 59-3 at 68.  Because Alvarado was a detainee of the United States Marshals Service (USMS), all medical care administered outside the LCCC had to be approved by the USMS.  *Id.* at 9. On February 25, 2019, the USMS approved Braksiek's referral to physical therapy (PT) and an appointment was set for March 7, 2019.  *Id.* at 79, 100.  At this appointment, the physical therapist recommended weekly treatments for six weeks.  *Id.* at 98.

Alvarado next complained of back pain on March 8, 2019.  Doc. 59-3 at 80.  A nurse (not named as a party to this case) placed him on the list to see the doctor, though there are no records suggesting Alvarado did.  *Id.*  On April 3, 2019, Ehrisman wrote in the nurses' observation log that while Alvarado requested to see the doctor for his back, he would be re-evaluated when he completed his physical therapy treatments.  *Id.* at 82. Two days later, on April 5, 2019, Alvarado filed a grievance about the care he had

received for his back issues and asked to see a doctor. Doc. 72 at 48. Sandvick responded that Alvarado was scheduled to be evaluated by the doctor that week. *Id.*

On April 9, 2019, the physical therapist notified Braksiek that Alvarado had failed PT. Doc. 59-3 at 69. Braksiek wrote in his treatment notes that Alvarado "would benefit from an MRI of his lumbar spine to rule out surgical disk disease or see if he would benefit from epidural at a certain level," though he did not meet with Alvarado. *Id.* Braksiek indicated he would file the request for an MRI with the USMS. *Id.* When Alvarado again complained of back pain on April 20, 2019, the nurse noted the LCCC medical staff was waiting for USMS approval for Alvarado to have an MRI. *Id.* at 83. On April 29, 2019, Alvarado filled out an inmate request form, which stated "I have been requesting to see the in-house doctor for 3 months, every single nurse here has placed me on the doctors sick call yet nurse Kelly has removed me at least six times." *Id.* at 61. It is not clear when the USMS approved Braksiek's request, but the LCCC scheduled Alvarado for an MRI on May 6, 2019. *Id.* at 43.

On May 5, 2019, Alvarado submitted three inmate request forms, expressing frustration with his treatment. Doc. 72 at 55-56. In one, he wrote that he had been denied medical care since February 2019. *Id.* at 56. In another, he requested a copy of his medical file. *Id.* In the third, he wrote that while he understood he would see the doctor after his MRI, officials had not addressed his other complaints. *Id.* at 55. He underwent an MRI the next day. Doc. 59-2 at 43.

Alvarado met with Ehrisman on May 7, 2019, and reported lower back pain. *Id.* at 85. Ehrisman told Alvarado he would meet with the doctor the next day to discuss his MRI. *Id.* The next day, Alvarado submitted two additional requests. Doc. 72 at 54, 55. First, he asked to see a doctor "for several medical issues." *Id.* at 54. In this request, he stated that he previously requested Wilson "look into why I have not seen a doctor - he wrote me back saying that I saw a doctor on 5-6-19! That's a really incredible thing seeing as I have not been off this tier! Someone is lying!" *Id.* In the second request, Alvarado wrote to Wilson that "someone has lied to you." *Id.* at 55. He again

3

noted that while he had an MRI on May 6, 2019, he had not seen a doctor. *Id.* Wilson wrote on the request that he had mistaken Alvarado's MRI for an appointment with Braksiek. *Id.*

At some point that day (May 8, 2019), Braksiek met with Alvarado and recommended a neurosurgery consultation for Alvarado's back. Doc. 72-3 at 2. At this appointment, Alvarado also complained that his sleeping arrangement worsened his back pain. Doc. 59-3 at 38. The LCCC subsequently submitted a request for a neurosurgery consultation to the USMS. Doc. 72-3 at 2.

Braksiek examined Alvarado again on June 3, 2019. Doc. 59-3 at 71. He noted that the USMS had deferred Alvarado's neurosurgery consultation for one month and recommended that Alvarado have an evaluation at the pain clinic. *Id.* The LCCC requested permission from the USMS to schedule the appointment, which was granted. Doc. 72-3 at 3. Alvarado received a spinal epidural in June, which brought some reprieve for several weeks. *Id.* Braksiek saw Alvarado again on August 6, 2019, and Alvarado reported his back pain had improved. Doc. 59-3 at 72.

Alvarado had another appointment with Braksiek on August 28, 2019, at which he requested that he be re-assessed in the pain clinic, as his pain had returned. *Id.* at 73. Again, Braksiek recommended to the USMS that Alvarado undergo a neurosurgery consultation for his back. *Id.* On September 10, 2019, the USMS approved Braksiek's referral and the LCCC scheduled Alvarado for a neurosurgery consultation with Darin Smith on September 27, 2019. Doc. 59-3 at 90. At the consultation, Smith concluded there was no need for surgery and instead recommended Alvarado undergo intermittent epidural steroid injections. *Id.* at 97. On October 10, 2019, the USMS approved another pain clinic consultation and an appointment was set for November 2, 2019, but was later rescheduled to December 6, 2019. *Id.* at 92. However, Alvarado did not attend the appointment because the USMS removed him from the LCCC on November 25, 2019. Doc. 59-2 at 5.

Throughout this time period, Alvarado also repeatedly requested the LCCC transfer him to a different housing tier to help relieve his back pain. The LCCC moved Alvarado to restricted housing in February 2019 after he assaulted two inmates. Doc. 59-3 at 10. While on restricted status, his mattress and bedding were removed during the day. *Id.* at 13. On May 24, 2019, Alvarado filed an inmate request asking to be placed on a tier where he had access to a bed during the day, as he had access only to a metal chair and the concrete floor, which contributed to his back issues. Doc. 72 at 52; 79-80. His disciplinary period ended in April 2019, but facility officials could not immediately move Alvarado back to his previous living space as they had to keep him separated from the individuals he assaulted. Doc. 59-3 at 10, 13, 59. Further, the USMS had a protective order on Alvarado, preventing him from being housed with yet another inmate. *Id.* at 13. He filed another request to be moved on May 29, 2019, and discussed it with Ehrisman on May 30, 2019. Doc. 72 at 52; Doc. 59-3 at 89. She noted he would remain in his current unit and LCCC staff would "continue to evaluate appropriate housing." Doc. 59-3 at 89. On June 19, 2019, Alvarado filed a grievance expressing frustration that he did not have access to a bed during the day. Doc. 72 at 45. Sandvick responded that as space became available, Alvarado would be moved to a dormitory-style cellblock. It is not clear if or when Alvarado moved out of restricted housing.

**B.    The May 9, 2019, Incident**

Alvarado's second claim relates to an incident that took place on May 9, 2019. Shortly after the 2:00 p.m. med pass (when medication is distributed), Alvarado attempted to get the nurse's and Sandersfeld's attention "to discuss their failure to provide me my medication." Doc. 72 at 80. Alvarado had received pain medication at 8:00 a.m. and Roberts instructed Sandersfeld that Alvarado should not have additional pain relievers in the afternoon, though this was incorrect. Sandersfeld told Alvarado he would return to discuss Alvarado's medication. *Id.* After roughly 30 minutes of waiting, Alvarado asked the tower officer for his medication, as he was in a lot of pain. *Id.* The tower

5

officer stated he would notify the medical staff. *Id.* Over the next hour, Alvarado repeatedly asked for his medication. *Id.* at 80-81. Around 4:00 p.m., there was a shift change and Sandersfeld and a nurse (not named as a party to this case) came to the tier for the next scheduled med pass. *Id.* at 80. The nurse informed Alvarado there had been a mistake, and while he should have been given medication at 2:00 p.m., they could not provide it to him now. *Id.* at 81. Sandersfeld told Alvarado, "You're not getting anything. Get back on the tier." *Id.* at 82.

What happened next is largely disputed. Alvarado asked to see a supervising sergeant, and Chapman radioed for a sergeant to respond to the fourth floor. *Id.* at 82. Sandersfeld repositioned himself and yelled, "Get back on the tier." *Id.* at 83. Sandersfeld states Alvarado became increasingly agitated. Doc. 59-3 at 24. According to Chapman, Alvarado was emotional and had begun to cry. *Id.* at 27.

According to Sandersfeld, Alvarado refused commands to return to the cell block or walk to the conference room. *Id.* at 24. Alvarado then "began to posture, clench his fists and cross and recross his arms." *Id.* at 49. At this time, Chapman arrived on the scene and attempted to deescalate the situation. Doc. 59-3 at 24. He had not initially approached the confrontation because it sounded as if it were a casual conversation about medicine. *Id.* at 27. In the incident report, Chapman wrote:

> [Alvarado] said that he wasn't going anywhere until he talked to a Sgt. Deputy Sandersfeld asked Alvarado to return to the Cell block, but he refused. After observing Alvarado's demeanor I called for Sgt. McElmeel 57-194 to come to the floor . . . . Deputy Sandersfeld asked Alvarado to walk to the conference room while we waited for Sgt. McElmeel to arrive, however he again refused to move. Deputy Sandersfeld gently grabbed Alvarado's right arm to guide him toward the conference room however he pulled away.
>
> I told Alvarado to calm down and not to pull away, as I secured his left arm in an escort position. Alvarado said he wasn't going anywhere with him, meaning Deputy Sandersfeld. I asked if he would walk with me. He said that he would however he then responded, "Take your hands off of me," again pulling away. I told him to relax and not make things worse than they already were, but he turned and squared off with Deputy Sandersfeld

6

and began to yell in his face. He continued to say he wasn't going anywhere until the Sgt. arrived. When he squared off with Deputy Sandersfeld it pushed him into the corner of the entry way not giving him an escape, and at that time I was the only one holding him.

In order to prevent Alvarado from harming Deputy Sandersfeld I placed him in an arm bar using his left arm and a rear head restraint turning his head away from Deputy Sandersfeld. I then pulled him back away from Deputy Sandersfeld. Deputy Sandersfeld was then able to regain control of his right arm and we were in the process of directing him to the ground, so as to be able to control his movements when assistance arrived. When the assistance from other Deputies arrived Alvarado was placed face down on the ground and secured in two sets of handcuffs linked together because of his size. I had Alvarado roll onto his right side and bring his knees to his chest. After doing so I assisted him with standing to his feet and escorted him to cell 9 of the first floor.

Doc. 59-3 at 49-50. Sandersfeld stated that "[i]n making these determinations in the moment, I considered Mr. Alvarado's size, his strength, the unsecured location, his level of aggression and resistance, and his history of violence in our facility." *Id.* at 24. Behle stated that once Alvarado was helped to a standing position, he was no longer resisting and allowed himself to be escorted. *Id.* at 34-35.

Alvarado describes the incident differently in his affidavit:

47.    . . . Sandersfeld repositioned himself from just in front of me and to my left to behind me and to my right and yelled in my right ear, "Get back on the tier!"

48.    Before I even had time to comply with his command, however, Sandersfeld immediately grabbed my right hand and violently twisted it in an unnatural direction.

49.    As he did so, I felt a painful "snap" in my right hand.

50.    I immediately screamed from the excruciating pain, which caused me to reflexively pull my hand back, intending to cradle it [to] my chest to protect it.

51.    Sandersfeld['s] actions caused me to shift my body so that he was facing me.

52.    At about the same time, I felt Chapman, from behind me, put his arm around my neck and place me in a "Rear Naked Choke Hold."

7

53.     As Chapman did so, Sandersfeld grabbed my injured hand again and proceeded to violently twist it into another unnatural position, while Chapman used his body weight and pulled backwards, cutting off my air supply.

54.     While all of that was occurring, several other deputies arrived on the scene.

55.     They forcibly took me to the floor, face first, by sweeping my legs from underneath me, the force of which caused me to strike my forehead on the concrete floor, hurting my face and head.

56.     At that point, Deputy Behel grabbed the back of my head by my hair and began repeatedly and violently slamming my face into the concrete floor, while other deputies began striking me with knee strikes and with their fists.

57.     I estimate I was continuously beaten up by deputies for up to 5 minutes, until I finally heard someone yell, "Cuff him!"

Doc. 72 at 82-84.

Steenblock spoke with Alvarado after the disturbance.  He states that Alvarado did not have any visible injuries or swelling and did not mention the use of excessive force. Doc. 59-3 at 18.  Alvarado asked Steenblock to watch the video recording of the incident. Doc. 72 at 85.  Alvarado alleges Sergeant Steve McElmeel (a nonparty to this case) told him that "[i]f you didn't do anything wrong, you will not receive a disciplinary report." Doc. 72 at 85.  Sandvick and McElmeel then viewed the jail recording of the incident. Doc. 73 at 3.

Sandersfeld opted not to initiate disciplinary measures against Alvarado and instead placed in him a 24-hour cool-down period.  Doc. 59-3 at 24-25.  Sandersfeld explained his reasoning as follows:  "Despite the poor choices Mr. Alvarado made, I decided not to initiate measures against him as I did believe that the root of his behavior was due to confusion regarding his medicine, and so I decided to give him a break."  *Id.* Alvarado did not receive any medical care, despite stating that he requested it.  Doc. 72 at 84-86.  The Linn County Sheriff's Department requires "medical assistance shall be obtained for any person who exhibits signs of physical distress, has sustained visible

8

injury, expresses a complaint of injury or continuing pain, or was rendered unconscious" after being subjected to a use of force. *Id.* at 22. There is some evidence in the record demonstrating Alvarado complained of the force used on May 9, 2019, after the fact. Alvarado submitted two inmate request forms on May 17, 2019, to make the administration aware "that the force used was extremely excessive" and requesting to speak with Wilson. Doc. 59-3 at 65.

There is conflicting evidence as to whether Alvarado suffered an injury. On May 20, 2019, he submitted a request to see a doctor for pain in both of his hands. Doc. 59-3 at 88. [3] At a June 3, 2019, appointment, Braksiek noted there was swelling on one of Alvarado's right-hand fingers. *Id.* at 71. At some point in June, Alvarado had x-rays taken of both hands, which were negative for any fractures. *Id.* at 72. At an August 6, 2019, appointment, Alvarado again reported pain in his right hand and a deformity on one finger, which Braksiek noted was new. *Id.* at 72. Braksiek attributed the deformity to osteoarthritis. *Id.* at 73. Braksiek referred Alvarado to a hand surgeon for a consultation. *Id.* at 72. On August 28, 2019, Braksiek noted that Alvarado reported the hand surgeon told him he had indeed suffered a fracture with a possible separation of the tendon, and that while the tendon could have been reattached, doing so at this stage would be difficult. Doc. 59-3 at 73. Braksiek indicated he would wait for any further recommendations from the hand surgeon. Doc. 59-3 at 73. [4]

There is a dispute as to whether the LCCC officials complied with administrative requirements concerning the incident. Jail officials did not file a "use-of-force report" with the state jail inspector after the interaction. Doc. 72 at 6. Wilson stated the use of force did not require a report, as the jail "has classified use-of-force as those situations where chemical agents, TASER use, striking instruments such as ASP, or hand/knee strikes are used. This was not the case in this incident." *Id.* However, Linn County

---

[3] Alvarado has a history of medical issues with his left hand.

[4] Neither party has provided any reports from the hand surgeon.

Sheriff's Policy requires that "[in] the event that anyone, detainee or staff member is injured (no matter how slight), reports and documentation will be filed by all officers involved." Doc. 72-1 at 38. Further, Assistant Ombudsman Clark Kauffman of the State of Iowa Office of Ombudsman has taken issue with this stance. While investigating Alvarado's complaint of excessive force, he wrote:

> Chapter 50.24(5)(g) of the Iowa Administrative Code requires that "reports of the following incidents shall be sent to the state jail inspection unit, department of corrections, within 24 hours of incident: (1) Any injury to juvenile or staff that requires medical attention. **(2) Any use of force by staff.** (3) Any attempted suicide. The state jail inspection unit, department of corrections, shall be notified within five hours of any successful juvenile suicide that occurred in a nonsecure hold area." (Emphasis added.)

> On August 2, you indicated the Linn County Jail defines use of force as "those situations where chemical agents, TASER use, striking instruments such as ASP, or hand/knee strikes are used." My concern is that this definition is far too narrow. It excludes physical restraints; mechanical restraints; take downs; distraction techniques such as elbow strikes and kicks; neck holds; choke holds; vascular neck restraints; bent-wrist locks; arm bars; finger grasps; and other techniques that are included in mandatory "use-of-force training" for law enforcement officers.

> By constructing such a narrow definition of use of force, the jail fails to comply with the law requiring it to report all use-of-force incidents.

> This is illustrated by the case at hand . . . . The fact that the jail administration doesn't consider this sort of intervention, which involved the physical restraint and take-down of an inmate by multiple staff members, to constitute a use of force, and didn't report the incident to the state's jail inspector, is troubling.

> Although the above-mentioned law does not define "force," the dictionary definition of the word is "to make someone do something against their will." Within the context of law enforcement, the definition of "use of force" that is cited most often - and is used by the National Institute of Justice and International Association of Chiefs of Police - is "the amount of effort required by police to compel compliance by an unwilling subject."

> I'm hoping you'll consider revising and expanding your definition of "use of force" so that it includes all of the physical interventions the staff is trained to use (including restraints and take-downs) to compel compliance,

and that you'll use this expanded definition to report such incidents to the
state jail inspector.

I believe such a change is necessary to bring the jail into compliance with
state law.

Doc. 72 at 5.

Soon after May 9, 2019, Alvarado requested LCCC staff preserve a copy of the
video recording of the incident. Doc. 73 at 3. LCCC officials later received a subpoena
from Alvarado and discovered that there was no video available of the event. *See* Doc.
72 at 6. Wilson stated the stationary video cameras automatically save video, but "purge"
when additional recording space is needed. Doc. 72-1 at 8.

## III.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims
asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the
pleadings, depositions, answers to interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue of material fact and that the moving
party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986). A material fact is one that "'might affect the outcome of the suit under
the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus,
"the substantive law will identify which facts are material." *Id.* Facts that are "critical"
under the substantive law are material, while facts that are "irrelevant or unnecessary"
are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel
v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could
return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler
Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence
that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475

U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

12

## IV.    ANALYSIS

### A.    *42 U.S.C. § 1983*

Alvarado asserts his claims under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). Thus, "[o]ne cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (42 U.S.C. § 1983 "merely provides a method for vindicating federal rights elsewhere conferred."); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution.). To state a claim under § 1983, a plaintiff must establish a "(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007).

Alvarado asserts defendants violated the Eighth Amendment's ban on cruel and unusual punishments in two respects. First, he claims they were deliberately indifferent

to his serious medical needs. Second, he argues he was subjected to excessive force on May 9, 2019. I will address each claim in turn.

## B.    *Deliberate Indifference to a Medical Need*

### 1.    *Legal Standard*

To demonstrate deliberate indifference to a medical need, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997)). An official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). The officials' knowledge must be two-fold; they must have recognized a substantial risk of harm and that their conduct was irresponsible considering the risk. *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021) ("The subjective prong has two components: '[T]he evidence must show that the officers recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk.'") (quoting *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015)). A plaintiff may prove the defendant's knowledge of the risk of harm through circumstantial evidence. *Letterman*, 789 F.3d at 862. For instance, a plaintiff may show the defendant "had been exposed to information concerning the risk and thus 'must have known' about it," or that the risk was obvious the defendant knew his or her actions were inappropriate. *Letterman*, 789 F.3d at 862 (quoting *Farmer*, 511 U.S. at 842).

A plaintiff must then show a defendant deliberately disregarded the risk. *Selk*, 508 F.3d at 873. This standard is akin to criminal recklessness. *Shipp*, 9 F.4th at 703. "Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the prison officials acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman,* 789 F.3d at 862 (quoting *Farmer*, 511 U.S. at 835). "[D]eliberate indifference requires a highly culpable state of mind

14

approaching actual intent." *Choate v. Lickhard*, 7 F.3d 1370, 1374 (8th Cir. 1993). A claimant's "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000). If a defendant responded reasonably to a risk, he or she is not liable, even if the plaintiff ultimately suffered an injury. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) (citing *Farmer*, 511 U.S. at 844).

To survive summary judgment, a plaintiff must show "grossly incompetent or inadequate care 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1242 (8th Cir. 1997)). "This inquiry is factually intensive and presents a 'substantial evidentiary threshold' to show that medical providers 'deliberately disregarded the inmate's needs by administering an inadequate treatment.'" *Redmond*, 999 F.3d at 1120 (quoting *McRaven v. Sanders*, 577 F.3d 974, 982 (8th Cir. 2009)).

### 2. *Analysis*

As defendants have noted, Alvarado's multiple resistances base his deliberate indifference claim on an entirely different set of facts than he alleged in his second amended complaint. In the complaint, Alvarado claims defendants "refused or delayed treating Alvarado for excruciating pain resulting from degenerative spine disease and bulging/herniated disks in his back, which required surgery to repair." Doc. 46 at 6. However, in his resistances to defendants' motion for summary judgment, Alvarado alleges they are liable because they failed to provide emergency medical care and treatment after the May 9, 2019, incident that is the basis of his excessive force claim. *See* Docs. 63, 66, 67.

While Rule 8 allows for a short and plain statement in a complaint that the pleader is entitled to relief, the purpose of the standard is "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gardner v. First American*

15

*Title Ins. Co.*, 294 F.3d 991, 994 (8th Cir. 2002) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). Alvarado is not entitled to assert this theory for the first time at the summary judgment stage. *Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("Thus, while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."); *Satcher v. University of Arkansas at Pine Bluff Bd. Of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[The plaintiff] attempts to expand his claims in his brief . . . . Having not raised this fact in his Complaint, [the plaintiff] cannot rely on it now.") Therefore, for the purposes of this motion, I will consider only those facts that relate to whether defendants refused to treat or delayed treating Alvarado's back pain. Doc. 46 at 6.

Because Alvarado did not address his back-injury claim in resisting defendants' motion for summary judgment, he has waived that claim.[5] Even apart from that waiver, however, the record does not demonstrate a genuine issue of material fact with respect to any particular defendant.[6]

### a.     *Amanda Roberts, Kelly Ehrisman and Robert Braksiek*

In his complaint, Alvarado alleged:

> Over the course of several months in 2019, Alvarado continuously and repeatedly complained to the defendant nurses that he was suffering from excruciating pain in his back and begged for help, or access to treatment, from them.

---

[5] "The 'failure to oppose a basis for summary judgment constitutes waiver of that argument,' because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) (quoting *Satcher*, 558 F.3d at 735).

[6] Because Alvarado does not make any allegations related to this claim against Wilson, Egli, Sandersfeld, Chapman, Bratek or Behel in the amended complaint, I do not consider them here.

Not only was Alvarado's complaints ignored, but in response to and in retaliation for his complaints, Dr. Braksiek, nurses Ehrisman and Roberts, individually and in concert, caused Alvarado to be removed from the doctor's call line, refused to provide treatment and medications for his pain, and Ehrisman refused Alvarado a bed, all of which resulted in unnecessary and needless and continuous pain and suffering.

Rather than arranging for and allowing back surgery, for approximately three months thereafter, Alvarado continued to complain that he was still suffering from severe pain and debilitating pain, with no relief, which was ignored by the defendant nurses, until he was finally sent to Mercy Hospital's pain clinic in Cedar Rapids, where he was given an epidural injection to relieve his pain. During this time, Dr. Braksiek had recommended a neurological consultation for Alvarado's back pain, but that request was denied by LCCC officials, and, therefore, Alvarado was only allowed to go to the pain clinic where the epidural had been administered.

As a result of Dr. Braksiek's and the defendant nurses' refusal to arrange for and permit surgery on his back, the injuries to Alvarado's back cannot be surgically repaired and are now permanent . . . .

Doc. 46 at 6-7.

Alvarado has not demonstrated Roberts, Ehrisman or Braksiek ignored his complaints. Roberts first treated Alvarado on May 9, 2019. Doc. 59-3 at 86. At that time, Alvarado wanted to know why he had not been seen by a doctor for several medical issues and she told him there were orders pending for him. As noted above, Braksiek had put in a request with the USMS for Alvarado to undergo a neurology consultation. Alvarado saw Roberts again on May 20, 2019. He requested to see a doctor for injuries to his hands and a muscle in his left pectoral and he wanted to know the results of a recent blood test. Roberts gave Alvarado his blood test results and placed him on the list for a doctor's call.

Ehrisman first treated Alvarado on April 3, 2019, where he complained of back pain. She wrote in the observation log that Alvarado was currently undergoing physical therapy and would be re-evaluated when he completed his treatments. In his April 29, 2019, inmate request form, Alvarado wrote that "nurse Kelly" had removed him at least six times from the list of inmates requesting to see the doctor, but he has not put forth

any evidence to substantiate this claim. Alvarado met with Ehrisman again on May 7, 2019, and reported lower back pain. She noted he would meet with the doctor the next day to discuss his MRI, and he did. Likewise, Alvarado received treatment from Braksiek on multiple occasions. Over the course of less than a year, Braksiek requested that the USMS provide Alvarado with physical therapy treatments, an MRI, multiple neurosurgery consultations, and appointments at the pain clinic whenever Alvarado's pain returned. There are no allegations that Braksiek refused to see Alvarado.

Further, Alvarado has not demonstrated Roberts, Ehrisman or Braksiek acted with deliberate indifference to a medical need by refusing him a bed during the day while he was in restricted housing. No facts suggest any of the three medical providers were responsible for housing decisions. Multiple LCCC staffers explained to Alvarado that he would remain in his unit until they could find housing compatible with his various protective orders. Even if there were alternative housing options available, and even if Roberts, Ehrisman or Braksiek had the authority to move him to another unit, Alvarado has not demonstrated that depriving him of a bed during the day amounted to a deliberate indifference to his medical needs.

Finally, Alvarado suggests these three defendants refused to permit him to undergo back surgery. The record does not support this claim. Whether Alvarado underwent back surgery was a decision for the USMS. Braksiek repeatedly asked the USMS to schedule a neurosurgery consultation, which it ultimately did. When Alvarado attended the consultation, the specialist did not recommend surgery. Alvarado has not put any facts into the record suggesting that he had a need for surgery and that the actions by Roberts, Ehrisman and Braksiek amounted to a deliberate indifference to that need.

Based on this record, defendants Roberts, Ehrisman and Braksiek are entitled to summary judgment.

### b.   Brian Gardner

Alvarado alleges

> Linn County Sheriff Gardner failed to train and supervise his LCCC subordinates (Wilson, Steenblock, Sandvick, Braksiek, and the other individually named defendants) who refused or delayed providing Alvarado reasonably necessary and adequate medical care . . . .

> Sheriff Gardner failed to receive, investigate, or act upon Alvarado's grievances, appeals, and complaints of unconstitutional activity by his subordinates.

Doc. 46 at 10-11. [7]

Supervisors may be held liable if "a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Perkins v. Hastings,* 915 F.3d 512, 524 (8th Cir. 2019) (internal quotation marks omitted) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).   A supervisor (1) must  have notice of a pattern of unconstitutional acts by the subordinate; (2) tacitly authorize the acts or act in a way that is deliberately indifferent to them; and (3) fail to take sufficient remedial action which (4) proximately causes an injury to the plaintiff. *Perkins*, 915 F.3d at 525.

Alvarado has not come close to demonstrating Gardner is liable for a violation of his Eighth Amendment rights.   Alvarado has not shown that any of Gardner's subordinates were deliberately indifferent to his medical needs, let alone that Gardner knew about a pattern of unconstitutional conduct that ultimately led to an injury.  Gardner is entitled to summary judgment.


### c.   Linn County

The defendants argue that Linn County, Iowa, is not a person for the purposes of Section 1983 liability, and therefore, the claim against the county must be dismissed as a

---

[7] In his briefing, Alvarado also argues Gardner "acted, or failed to act," with deliberate indifference to his serious medical need after the May 9, 2019, incident.  However, and as noted above, Alvarado cannot change the basis for his claim at this late stage of litigation.

19

matter of law.  Doc. 59-1 at 9.  However, as Alvarado notes, § 1983 may apply to local governmental units.  Doc. 67 at 11 (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978)).  To bring a claim against a municipality under § 1983, "a plaintiff cannot state a claim . . . on a respondeat superior theory, but must instead show that a 'policy or custom' of the municipality caused a constitutional violation." *Ness*, 11 F.4th at 922 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978)).  Put differently, to establish a claim against the municipality, a plaintiff must show "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise" lead to a constitutional violation.  *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (internal quotation marks omitted); *see also Whitney v. City of St. Louis,* 887 F.3d 857, 861 (8th Cir. 2018) (stating there can be no municipal liability under § 1983 without a constitutional violation by an agent of the municipality).

To prove an unofficial custom existed,

> the plaintiff must prove (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the governmental entity's custom.

*Mitchell v. Kirchmeier*, 28 F.4th 888, 889-90 (8th Cir. 2022) (cleaned up).  Again, Alvarado does not come close to making the necessary showings.  He has not demonstrated a constitutional violation based on a deliberate indifference to a medical need, let alone that a Linn County policy led to that violation.  Linn County is entitled to summary judgment.[8]

---

[8] Alvarado has also named the individual defendants in their official capacities.  Claims against municipality officials in their official capacities are treated as claims against the municipalities. *Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021).  Therefore, this analysis applies to the individual defendants named in their official capacities.

## C.    *Excessive Force*

### 1.    *Legal Standard*

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted).   When prison officials are accused of using excessive physical force, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017) (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7, (1992)).   As the Eighth Circuit Court of Appeals has explained:

> This inquiry turns on such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted, from which inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.   The word "sadistically" is not surplusage; "maliciously" and "sadistically" have different meanings, and the two together establish a higher level of intent than would either alone.

*Gutzmer*, 866 F.3d at 974 (cleaned up).

This standard is "highly deferential." *Id.*   Prison officials should be given "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Hudson*, 503 U.S. at 6).   "If the evidence shows only 'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives . . . the case should not go to the jury.'" *Gutzmer*, 866 F.3d at 957 (quoting *Whitley*, 475 U.S. at 322).   Finally, each officer's actions are evaluated separately. *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.'   Section 1983 does not sanction tort by association."

*Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805–06 (8th Cir. 2010) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)).

Alvarado alleges that Sandersfeld, Chapman, Bratek and Behel assaulted him on May 9, 2019. Alvarado also alleges Gardner is liable as a supervisor, and Linn County is liable for its policies which he states led to the assault.[9]

### 2. Analysis

#### a. Sandersfeld, Chapman, Bratek and Behel

Alvarado and the remaining defendants offer diametrically opposed versions of the events that took place on May 9, 2019. The defendants argue that these factual disputes are not material because "[e]ven if the Court relies exclusively on Mr. Alvarado's description of how he was treated by deputies, the evidence is clear that the force used by deputies was reasonable." Doc. 59-1 at 14. They state that "[t]he brevity and lack of severity of the restraint of Plaintiff is clear evidence that the force used was no more than that which was necessary to ensure security and maintain penological order." Doc. 59-1 at 15. Further, defendants argue there is an "absolute lack of injury," which is relevant to the analysis. *Id.* at 16. The defendants also argue that Behel and Bratek arrived on the scene after Chapman and Sandersfeld were in a physical struggle with Alvarado, and "[s]eeing two deputies struggling with a violent inmate and assisting to restrain him is the epitome of reasonable force." *Id.* Finally, defendants argue that Bratek cannot be liable because he did not take part in directing Alvarado to the ground.

Alvarado contends that defendants are not entitled to summary judgment for two reasons: (1) the parties offer two distinct versions of events, and only a jury can determine

---

[9] Alvarado makes no argument Roberts, Ehrisman, Braksiek, Egli, Wilson, Sandvick or Steenblock subjected him to excessive force. Therefore, these defendants are entitled to summary judgment on this claim. Separately, Alvarado argues "Anderson" and "Henderson" are not entitled to summary judgment on various claims. *See, e.g.*, Doc. 63 at 3, 9, 10, 12; Doc. 66 at 9, 12, 13. However, no one named "Anderson" or "Henderson" is named as a defendant in this case.

credibility, and (2) because defendants had sole possession of the video recording of the incident, and that video no longer exists, he is entitled to an adverse inference about the contents of the video, which precludes summary judgment. Of course, the fact that Alvarado's version of events differs from that of defendants does not, by itself, end the analysis. If the dispute is over reasonableness of the force alone, the case does not go to the jury. *Gutzmer*, 866 F.3d at 957. Further, whether Alvarado is entitled to an adverse inference with regard to the missing video is an issue that is not appropriately resolved at this stage of litigation, though I do find it relevant. Ultimately, the issue is whether a reasonable jury could find defendants acted "maliciously and sadistically to cause harm.'" *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014).

Sandersfeld, Chapman and Behel all admit to subduing Alvarado with some level of force. No party disputes that Alvarado did not see a doctor until nearly a month later, likely in violation of Linn County policy. While defendants argue Alvarado did not suffer an injury, there is evidence he had in fact fractured his hand. Further, while Bratek described Alvarado as "out of control," Doc. 59-3 at 31, Sandersfeld decided to "give him a break" and did not initiate any disciplinary proceedings after Sandvick viewed the video of the incident. Doc. 59-3 at 25. Defendants did not file a "use of force" report, which may have violated both the jail policy and state law.

Of course, the most stubborn issue is the lack of video evidence. It is undisputed that LCCC cameras recorded the incident. Sandvick viewed the video after the incident took place. Defendants admit that Alvarado requested they preserve the video within days after the incident, but it was not archived. When Kauffman from the State Ombudsman's Office requested information as to why the video was not in the archive, a reasonable juror could find that Wilson's response was either evasive or nonresponsive.[10] For instance, Wilson did not answer Kauffman's inquiry as to how long the LCCC retains videos before they are recorded over. The answer to this question is

---

[10] Doc. 72-1 at 1-12.

still not in the record. This uncertainty is further complicated by the fact that Wilson had been previously disciplined for failing "to ensure a professional, effective, and nondiscriminatory environment" in the LCCC.[11]

Viewing all of these facts in the light most favorable to Alvarado, a reasonable juror could find Alvarado was subject to excessive force by the LCCC employees who subdued him. Applying the *Whitley* factors, a juror could find the force applied was intended to maliciously or sadistically cause harm. The first *Whitley* factor is the need for the application of force. Alvarado alleges that defendants used force before he was able to comply with their demands. Further, a reasonable juror could find defendants' allegations that Alvarado became increasingly agitated unpersuasive, as even Chapman has stated he first believed the incident was simply a discussion of medicine. Even if there was some need to apply force, a reasonable juror could find the use of force far exceeded what was necessary to maintain or restore discipline. Alvarado alleges defendants violently slammed his face into a concrete floor, while other deputies struck him with their knees and fists, even though Alvarado was not resisting. Further, Alvarado alleges defendants choked him, and he was continuously beaten by deputies for up to five minutes. Finally, while the extent of Alvarado's injury is unclear, a reasonable juror could find that Alvarado had suffered a fracture in his right hand. Ultimately, the "core inquiry" is whether defendants applied force in a good-faith effort to maintain or restore discipline, or whether they acted maliciously and sadistically to cause harm.

---

[11] Doc. 68 at 11-12. This unrelated investigation found Wilson failed to act on multiple written complaints by a deputy who alleged he had been discriminated against for taking leave guaranteed to him by the Family Medical Leave Act. The report also suggested Wilson had repeatedly shirked his supervisory responsibilities. For instance, the investigation found that Wilson would purposefully avoid particular places in the LCCC so "deputies could be themselves." The report stated: "There are no 'zones' where those expectations do not apply, where deputies can do whatever they feel, heedless of County policies or professional expectations. Major Wilson did not meet this oversight responsibility, not only in failing to ensure that his supervisors stopped immature and offensive behavior that they observed, but also specifically in not responding to the deputy's direct requests for help."

Case 1:19-cv-00086-LTS-MAR   Document 74   Filed 02/01/23   Page 24 of 27

A reasonable juror could find that defendants prevented Alvarado from seeing a doctor to treat his injury and then deleted the video footage of the incident. Both of these facts would support a finding that the force applied was not a good-faith effort to maintain or restore discipline.

It is undisputed that Sandersfeld, Chapman and Behel used force to subdue Alvarado. A genuine issue of material fact exists as to whether that force was excessive, thus precluding summary judgment in their favor. However, Bratek is entitled to summary judgment, as there is no evidence that he used force against Alvarado during the May 9, 2019, incident.

### b. Brian Gardner

Alvarado alleges:

> Linn County Sheriff Gardner failed to train and supervise his LCCC subordinates (Wilson, Steenblock, Sandvick, Braksiek, and the other individually named defendants) who . . . subjected him to the use of excessive force in violation of Alvarado's constitutional rights.

> Sheriff Gardner failed to receive, investigate, or act upon Alvarado's grievances, appeals, and complaints of unconstitutional activity by his subordinates

Doc. 46 at 11-12. As with his claim for deliberate indifference to a medical need, Alvarado has not demonstrated that Gardner had any notice of any unconstitutional actions, nor that he authorized the acts or was deliberately indifferent to them. Therefore, Gardner is entitled to summary judgment.

### c. Linn County

Similarly, Alvarado argues:

> because of Linn County's . . . official policy or unofficial custom and practice of not ensuring the videos of alleged incidents of excessive force are archived and preserved for documentation and evidentiary purposes enhances the risk that the constitutional rights of its detainees, such as Mr.

> Alvarado, will be more easily violated, Linn County is not immune from suit.

Doc. 67-1 at 12. Alvarado has not demonstrated that any policy or custom of the municipality lead to a violation of his rights. He has not pointed to any continuous or widespread pattern of unconstitutional conduct. There is evidence only that Linn County officials did not preserve a video record of one alleged incident of excessive force, which does not amount to a persistent pattern of unconstitutional conduct.[12] Therefore, both Linn County and those defendants named in their official capacities are entitled to summary judgment.

### D.    *Qualified Immunity*

Alternatively, defendants argue they are entitled to qualified immunity. "Qualified immunity protects a government official from liability in a [section] 1983 claim unless his or her conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known." *Vaughn v. Greene County, Ark.*, 438 F.3d 845, 849 (8th Cir. 2006) (quoting *Pool v. Sebastian County, Ark.*, 418 F.3d 934, 942 (8th Cir. 2005)). "To overcome qualified immunity, plaintiffs must demonstrate both that '(1) there was a deprivation of a constitutional or statutory right, and (2) the right was clearly established at the time of the deprivation.'" *Davis v. County of Gage*, *Nebraska*, 807 F.3d 931, 936 (8th Cir. 2015) (quoting *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015)). However, I have determined that a reasonable factfinder could find that Sandersfeld, Chapman and Behel violated Alvarado's Eighth Amendment rights by employing excessive force. Defendants have not demonstrated that those rights were not clearly established as of the date of the incident. As such, the remaining defendants

---

[12] Further, Alvarado has not demonstrated how the LCCC's recording policies led to the use of excessive force. While dubious, I do not address this issue because Alvarado has failed to demonstrate the persistent pattern of unconstitutional conduct and neither party addressed the issue.

(Sandersfeld, Chapman and Behel) are not entitled to summary judgment based on qualified immunity.

## V. CONCLUSION

For the reasons set forth herein:

1. Defendants' motion for summary judgment (Doc. 59) is **denied** as to plaintiff's excessive force claims against defendants Corey Sandersfeld, Joseph Chapman and Chelsea Behel in their individual capacities. Those claims remain for trial. The motion for summary judgment is **granted** as to all other claims and defendants.

2. The trial of the remaining claims, currently scheduled to begin **March 6, 2023**, is hereby **continued** due to conflicts with the undersigned's criminal trial docket. The final pretrial conference, currently scheduled for February 22, 2023, is also **continued**. A new trial date will be established after consultation with counsel.

**IT IS SO ORDERED.**

**DATED** this 1st day of February, 2023.

_____
Leonard T. Strand, Chief Judge